SUMMONS ISSUED

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

CV 14 - 4346

SECURITIES AND EXCHANGE COMMISSION,

          Plaintiff,

        -against-

ABRAXAS J. DISCALA,
MARC E. WEXLER,
MATTHEW A. BELL,
CRAIG L. JOSEPHBERG, and
IRA SHAPIRO,

          Defendants.

ECF CASE

COMPLAINT

KUNTZ, J.

LEVY, M.J.

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against

defendants Abraxas J. Discala ("Discala"), Marc E. Wexler ("Wexler"), Matthew A. Bell

("Bell"), Craig L. Josephberg ("Josephberg"), and Ira Shapiro ("Shapiro"), alleges as follows:

## SUMMARY

1.     This case involves a sophisticated scheme executed by a ring of individuals who

acted in concert to manipulate the securities of three different publicly traded companies in 2013

and 2014 and generate millions of dollars in illegal proceeds.

2.     In 2013, Discala and Wexler, who served as the CEO and President respectively

of OmniView Capital Advisors LLC ("OmniView"), a self-described "merchant banking firm,"

conspired with registered representatives Bell and Josephberg to inflate the price of the stock of

CodeSmart Holdings, Inc. ("CodeSmart").  Discala, Wexler, Bell, and Josephberg then profited

by selling their shares at inflated values at the expense of Bell's clients and Josephberg's

customers.  Shapiro, who served as CodeSmart's CEO, participated in the manipulative scheme

by issuing materially misleading statements in press releases on at least three occasions in order to increase the price and volume of the stock.

3.     Following CodeSmart's reverse merger into a public shell company in May 2013, Discala and his associates, including Wexler, Bell, and Josephberg, obtained control of 3,000,000 shares of CodeSmart. These shares were restricted; they were not eligible to be offered or sold to the general public.

4.     Later in May 2013, Discala and Wexler flooded the market with CodeSmart's shares. They found ready buyers in Bell's advisory clients and Josephberg's brokerage customers. Both Bell and Josephberg received 125,000 purportedly unrestricted shares of CodeSmart for pennies in exchange for investing their client and customer base in CodeSmart stock, which in many cases consisted of their client's and customer's retirement funds. In addition, both representatives personally dumped their CodeSmart shares on the market while at the same time purchasing CodeSmart's stock in the accounts of their clients and customers—sometimes on the same day. Bell and Josephberg failed to disclose to their clients and customers their financial incentive to purchase CodeSmart shares for them and sold the shares to their clients and customers knowing that the price had been inflated at the direction of Discala and Wexler, who orchestrated the scheme.

5.     The Defendants' scheme was effective in manipulating the market in CodeSmart's securities. On July 12, 2013, CodeSmart stock was $6.94, which equated to a market capitalization of over $100 million. Over a month later, on August 30, 2013, CodeSmart's stock price was $4.60, which equated to a market capitalization of over $86 million. These valuations had no relationship to CodeSmart's true worth as indicated in its publicly available financial statements. As of July 12, 2013 and August 30, 2013, the only

2

publicly available financial information for CodeSmart indicated that it had minimal assets and a loss from operations. Indeed, after Discala, Wexler, Bell, and Josephberg reduced their trading in its shares, CodeSmart's stock price crashed to earth and it is currently trading at below ten cents per share.

6. The scheme was highly profitable for the Defendants. Discala and Wexler reaped millions of dollars of illicit gains from their participation in the scheme and Bell and Josephberg both reaped in excess of $500,000 of illicit gains. For his part, Shapiro received a $225,000 salary from CodeSmart and, in at least one instance, other financial support from a Discala-controlled entity.

7. In 2014, Discala, Wexler, Bell, and others have conspired to manipulate the securities of two other publicly traded companies, Cubed, Inc. ("Cubed") and The Staffing Group, Ltd. ("Staffing"), by coordinating their trading in the securities of these companies in order to create a false impression of market activity. In text messages that Discala and Wexler exchanged in April 2014, they contemplated that Cubed would be an even more profitable scheme than CodeSmart. After Wexler complained in one text about $88,000 in state taxes resulting from the scheme involving "codesh[*]t," Discala replied "88m. Next y[ea]r from cube." Cubed stock ultimately increased to $6.58 on June 24, 2014, which translated into a market capitalization of $170 million, even though Cubed's public filings indicated it had minimal assets.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

8. The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77t(b)] and Section 21(d) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78u(d)].

9.     The Commission seeks to permanently restrain and enjoin: (a) Discala and Wexler from future violations of Sections 5(a), 5(c) and 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)(1) and (3)], and Sections 9(a) and 10(b) of the Exchange Act [15 U.S.C. §§ 78i(a) and 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)]; (b) Bell and Josephberg from future violations of Sections 5(a), 5(c) and 17(a)(1)-(3) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)(1)-(3)], and Sections 9(a) and 10(b) of the Exchange Act [15 U.S.C. §§ 78i(a) and 78j(b)] and Rules 10b-5(a)-(c) thereunder [17 C.F.R. §§ 240.10b-5(a)-(c)]; and (c) Shapiro from future violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a)-(c) thereunder [17 C.F.R. §§ 240.10b-5(a)-(c)].

10.     The Commission also seeks a final judgment ordering the Defendants to disgorge their ill-gotten gains (on a joint and several basis) together with prejudgment interest thereon, and to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]. The Commission seeks an order against Defendants that imposes a penny stock bar pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)]. In addition, pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], the Commission seeks an order barring Discala, Wexler, and Shapiro from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)]. Finally, the Commission seeks any other relief the Court may deem just and appropriate.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to Section 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(d) and 77v(a)], and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

12.     Venue lies in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], and Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and 78aa]. Certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within the Eastern District of New York and were effected, directly or indirectly, by making the use of means or instrumentalities of transportation or communication in interstate commerce, or the mails.  For example, certain participants in the scheme involving CodeSmart had communications directing stock transactions and taking other related steps in the scheme that occurred in the Eastern District of New York.

## DEFENDANTS

13.     **Discala**, age 43, resides in Norwalk, Connecticut.  Discala is the CEO of OmniView and Fidelis Holdings LLC ("Fidelis").

14.     **Wexler**, age 52, resides in Colts Neck, New Jersey.  Wexler is the President of OmniView.

15.     **Bell**, age 47, resides in Helotes, Texas.  While Bell is not currently associated with any registered entity, in 2013, Bell was employed as an investment adviser representative at a Texas-based registered investment adviser.  Previously, Bell worked as a registered representative at various registered broker-dealers.  Bell holds Series 7, 63, and 65 securities licenses.

16.     **Josephberg**, age 41, resides in New York, New York.  Josephberg is currently a

5

registered representative with a New York City-based registered broker-dealer. In 2013, Josephberg was a registered representative with another New York City-based registered broker-dealer. Previously, Josephberg worked as a registered representative at various registered broker-dealers. Josephberg holds Series 7 and 63 licenses.

17. **Shapiro**, age 53, resides in Congers, New York. Shapiro is the Chairman and CEO of CodeSmart. During his time at CodeSmart, he received a salary of $225,000.

## RELEVANT ISSUERS

18. **CodeSmart** is a Florida corporation with its principal place of business at a residential address in Mohnton, Pennsylvania. CodeSmart's common stock is registered with the Commission pursuant to 12(g) of the Exchange Act and its shares currently are quoted on OTC Link (formerly "Pink Sheets") operated by OTC Markets Group, Inc. under the symbol "ITEN." CodeSmart originally was known as First Independence Corp. ("First Independence"), a development-stage company, incorporated in Florida purportedly to become a pourable food (*e.g.*, condiment) manufacturer. CodeSmart claims to educate medical practitioners on a new medical coding system required to take effect as part of The Patient Protection and Affordable Care Act of 2010. For the period ending June 30, 2013, CodeSmart reported cash of $261,592, a stockholders' equity deficit of $992,504, and a loss from operations of $1,256,465.

19. **Cubed** is a Nevada corporation headquartered at a former FedEx Office Print & Ship Center in downtown Las Vegas. Cubed's common stock is registered with the Commission pursuant to Section 12(g) of the Exchange Act and its shares currently are quoted on OTC Link under the symbol "CRPT." Prior to March 2014, Cubed was known as Northwest Resources, Inc. ("Northwest"), an exploration stage mining company. Cubed purports to be a software technology start-up developing and marketing an application for mobile device owners.

20.     **Staffing** is a Nevada corporation headquartered in New Orleans, Louisiana. Staffing's shares, which are not registered with the Commission, currently are quoted on the OTC Link under the symbol "TSGL." Staffing is the surviving entity after reverse mergers with Aviana Corp. ("Aviana") and EmployUS, Ltd. in August 2013 and January 2014, respectively. Staffing's primary focus is to provide employees to companies in the construction, light industrial, refuse, stevedoring, and ship repair industries.

## OTHER RELEVANT ENTITIES

21.     **OmniView** is a Delaware limited liability company based in Norwalk, Connecticut and New York, New York. OmniView describes itself as a "merchant bank providing access to capital and advisory services to fast growing companies that have reached an inflection point in their development." OmniView is controlled by Discala.

22.     **Fidelis** is a Delaware limited liability company based in Norwalk, Connecticut that Discala controlled.

23.     **Garper LLC** ("Garper") is a Delaware limited liability company with an address in New York, New York at an apartment associated with Josephberg. Josephberg's spouse is Garper's managing member.

## FACTS

### I.     The Scheme Involving CodeSmart

A.     Discala, Wexler, Bell and Josephberg Obtain Control of CodeSmart Securities

24.     After a series of complex transactions carried out in 2012 and 2013 (described in greater detail below), Discala and his associates, including Wexler, Bell, and Josephberg, obtained control of 3,000,000 shares of CodeSmart.

25.     As of May 2013, Discala, Wexler, Bell, and Josephberg directly controlled

7

1,537,500, or approximately 51 percent, of the 3,000,000 shares of CodeSmart. Discala owned or controlled 912,500 shares; Wexler owned 375,000; and Bell and Josephberg each owned 125,000 shares. In addition, the remaining 49% of the 3,000,000 shares were sent to people associated with Discala, including 250,000 shares to Discala's father, 125,000 shares to Discala's attorney's firm; 125,000 shares to Discala's bookkeeper, and 62,500 shares to one of the principals of Josephberg's employer and the principal's son. As a result of a stock split that occurred on June 14, 2013, the 3,000,000 shares controlled by Discala and his affiliates doubled to 6,000,000 shares.

B.      Discala, Wexler, Bell, and Josephberg Manipulate the Market for CodeSmart Securities

26.      Between May 13, 2013 and September 20, 2013, Discala, Wexler, Bell, and Josephberg exercised their control over CodeSmart securities to maintain a market in CodeSmart shares and enable them to sell their substantial CodeSmart stock holdings and make millions of dollars in profits.

i.      *The CodeSmart Pump and Dumps*

27.      CodeSmart's stock was involved in two pump and dumps in 2013. The following chart illustrates the price and volume of CodeSmart's stock during the period of the pump and dumps.

8



28.     The first pump and dump occurred between approximately May 13, 2013 and August 21, 2013. During that time, after building up for a month to a peak on July 12, 2013, the share price dropped by 68 percent by August 21, 2013.

29.     This first pump was strongly aided by a promotional campaign. In the period between May 13, 2013 and July 12, 2013, CodeSmart issued press releases at the approximate rate of one press release every three days, and in that period the stock price of CodeSmart rose by 291 percent. Discala would at times edit CodeSmart press releases before they were issued.

30.     The second pump and dump occurred between August 22, 2013 and September 20, 2013. During that time, the price spiked again on August 30, 2013, and quickly dropped 54 percent by September 20, 2013. Again, during this time period, CodeSmart issued multiple press releases.

31.     In addition to the stock's trading pattern, CodeSmart's stock price failed to reflect economic reality. At a stock price of $6.94, a price reached on July 12, 2013, CodeSmart's market capitalization was over $100 million, and at a stock price of $4.60, a price reached on August 30, 2013, CodeSmart's market capitalization was over $86 million. However, the only

9

publicly available financial information for CodeSmart indicated that CodeSmart had minimal assets and a loss from operations.

ii.  *Discala, Wexler, Bell, and Josephberg Use Bell's Client Accounts to Trade Up the Price of CodeSmart's Stock and Dump Their Shares*

32.    Between May 13, 2013 and May 29, 2013, Wexler, Discala, and accounts Discala controlled sold approximately 340,000 shares of CodeSmart's stock. During that time period the price of CodeSmart's stock spiked, moving from $3.55 when trading opened to $5.47—a 70 percent increase.

33.    The buyers of these shares were mainly Bell clients. Bell had discretion over his clients' accounts and engaged in match orders with Discala and Wexler.[1] For example, on May 16, 2013, Wexler sold 1,000 shares at $4.34 per share directly to a client of the registered investment adviser where Bell was employed. On both May 17, 2013 and May 24, 2013, Wexler sold 2,000 shares directly to clients of Bell's employer. All told, clients of Bell's employer purchased approximately 205,000 shares of CodeSmart during this time period.

34.    To coordinate the matched trading during the main pendency of the market manipulation, Bell was in near constant touch with Discala and Wexler. Between May 1, 2013 and October 18, 2013, Bell and Discala spoke or texted close to 6,000 times, and Bell spoke or texted with Discala's assistant close to 400 times. Bell and Wexler also spoke or texted close to 80 times.

35.    At the same time that he was buying CodeSmart's stock in his clients' accounts, Bell was selling those shares from his personal trading account. Bell deposited his 125,000

---

[1]    A matched trade is an order to buy or sell securities that is entered with knowledge that a matching order on the opposite side of the transaction has been or will be entered for the purpose of (1) creating a false or misleading appearance of active trading in any publicly traded security or (2) creating a false or misleading appearance with respect to the market for any such security.

CodeSmart shares in an account he opened at a brokerage firm that was not affiliated with his employer. From May 2013 through October 2013, while clients of Bell's employer purchased over one million shares of CodeSmart, Bell sold 99,500 shares of CodeSmart that were in his personal account.

36. For example, on June 25, 2013, Bell bought over 1,400 shares of CodeSmart in his employer's clients' accounts. The very next day Bell sold 5,000 shares of CodeSmart from his personal account. On June 27, 2013, Bell bought 1,500 shares of CodeSmart for the account of his clients while selling 5,000 shares of CodeSmart from his personal account. Thus, while Bell profited from the sale of shares from his own trading account, Bell purchased CodeSmart shares in client accounts without telling them that he had a major financial incentive to recommend the stock to them or that they were buying CodeSmart stock at artificial prices. Nearly half of the one million shares purchased by accounts of clients of Bell's employer were in Individual Retirement Accounts.

37. In August 2013, when two of Bell's clients complained to him and his supervisor about the CodeSmart stock purchases, Bell presented the clients with a stock purchase agreement for 30,000 shares of CodeSmart at $0.14 per share. (At the time, CodeSmart shares were trading at approximately $2.20 per share.) Discala signed the agreement on behalf of Fidelis, which was the seller of the shares. In light of where CodeSmart's stock was trading at the time, Bell represented that the value of the clients' accounts would immediately increase by a significant amount.

        iii. *Discala, Wexler, Bell, and Josephberg Use Josephberg's Customer Accounts to Trade Up the Price of CodeSmart's Stock and Dump Their Shares*

38. Like Bell, Josephberg also used his customers' accounts to enable himself and

Discala, Wexler, and Bell to manipulate the price of CodeSmart's stock and to then sell out of their CodeSmart positions. In particular, during the second pump and dump that took place between August 22, 2013 and September 20, 2013, Josephberg and his assistant engaged in heavy buying of CodeSmart's shares in Josephberg's customer accounts at artificial prices. Between August 29, 2013 and September 20, 2013, accounts controlled by Josephberg purchased at least 100,000 shares of CodeSmart in customer accounts. Much of Josephberg's trading involved match trades. For example, on September 25, 2013, Josephberg bought 1,500 shares into one of his customer's accounts on the same day that Wexler sold a net total of 16,000 shares.

39. Josephberg and Discala were in near constant touch throughout the pendency of the pump and dumps. Between May 1, 2013 and October 31, 2013, Josephberg and Discala called or texted each other close to 8,000 times.

40. In addition, throughout the entire period of the CodeSmart manipulation scheme, Josephberg was in frequent e-mail contact with Discala and his assistant. For example, in early May, Josephberg was copied on emails concerning setting up a nominee account with Josephberg's employer in which Discala could conduct trading. Later in May, Josephberg was copied on emails between Discala and others attaching letters concerning the issuance of CodeSmart stock to various nominees, including OmniView, Fidelis, and Garper. In July, Josephberg forwarded an email in which an attorney for a potential CodeSmart investor expressed concern that Fidelis was attempting to sell CodeSmart stock for $0.28 per share when the stock was publicly quoted at $6.70 per share. In late August, Josephberg sent an email concerning several CodeSmart stock trades by another potential participant in the scheme where the participant had placed orders to purchase over 45,000 shares of CodeSmart, but never actually paid for the trades.

41. At the same time that he was buying CodeSmart's shares in his customers' accounts, Josephberg was selling shares through accounts that he controlled. From May 2013 through October 2013, Josephberg purchased at least 140,000 shares of CodeSmart stock on behalf of his clients while selling at least 256,000 shares of CodeSmart that were in a Garper account. For example, on August 29, 2013, Josephberg bought 9,000 CodeSmart shares in the accounts of two of his customers, while selling 8,100 shares through a Garper account. Josephberg never disclosed to these customers that that he had a major financial incentive to recommend the stock to them or that they were buying CodeSmart's stock at artificial prices.

            iv. *Discala and Wexler Coordinate the Manipulation of CodeSmart's Stock*

42. Discala and Wexler engaged in matched trading by coordinating their trading closely with each other and with Bell and Josephberg in order to manipulate CodeSmart's stock price and then sell their shares at a substantial profit. Discala watched a live trading feed throughout market hours during the pendency of the manipulation and was often on the phone instructing individuals to make purchases and sales.

43. Discala carried out a substantial portion of the trading in nominee accounts, including accounts held by OmniView and Fidelis. Discala spread his holdings out among several entities and individuals that he controlled to avoid being seen as holding more than five percent of the outstanding shares of CodeSmart and thereby becoming subject to Commission reporting obligations. For example, during the manipulation scheme, Discala controlled the trading in a brokerage account maintained by his assistant and received profits from trading in that account. To avoid directly paying the firm that cleared trades in the assistant's account, Discala arranged for monies to be routed from his bank account to his assistant's account and then to his assistant's brokerage account.

44.     After CodeSmart's shares began trading in May, and continuing at least until September 2013, Discala and Wexler carried out active trading in CodeSmart's stock. This trading, which often constituted a significant portion of the volume of trading in CodeSmart's stock in any given day, included multiple days where Discala and Wexler bought and sold large amounts of stock with no evident economic purpose. Discala repeatedly paid excessive commissions for his transactions in CodeSmart's shares. At one point, Discala received a letter from a brokerage firm where he was placing trades warning him that the commissions he was paying for his trading were excessive. Even after receiving this letter, Discala continued to use that brokerage firm to trade CodeSmart's stock.

> v.     *Shapiro Participates in the CodeSmart Scheme by Making Materially Misleading Statements Concerning CodeSmart to the Public*

45.     Shapiro misrepresented material facts or omitted material facts that would have been necessary to make his representations not misleading in CodeSmart's press releases in connection with both pump and dumps, and these material misrepresentations or omissions contributed to the increases in CodeSmart's stock price.

46.     On August 26, 2013, Shapiro released a letter to CodeSmart's shareholders that stated, "If we continue on the track we are on, I believe we will achieve our revenue and profit goals that were previously disclosed for 2013 and beyond." The very next day, CodeSmart issued a press release entitled, "Codesmart Group CEO, Ira Shapiro, Purchases 25,000 Shares of Company Stock from the Public Market." The press release quoted Shapiro as stating, "This stock purchase is symbolic of my confidence in the Company and its mission to both prepare coders for the ICD-10 change in October 2014 . . . ."

47.     Discala believed that the press release would cause the price of the stock to increase. On August 27, 2013, the stock price closed 14 cents higher than the day before on

14

almost 200,000 shares of volume.

48.    The quote omitted material facts because Shapiro knew, but failed to state, that he intended to pay for these shares with money supplied by Discala.

49.    Indeed, after placing the trade purportedly on Shapiro's behalf on August 27, Josephberg emailed Discala's assistant – and not Shapiro – to seek payment for the shares on September 3, 2013. Discala caused approximately $81,000 to be wired from Fidelis' bank account to Shapiro's bank account so that Shapiro could purchase the shares.

50.    Shapiro signed a promissory note with OmniView to pay back the money used to purchase the shares (even though the funds for the purchase had apparently come from Fidelis). The rate of interest on the unsecured note was a below market rate of .5% and the interest and principal were not due to be repaid for 18 months. This promissory note was also not disclosed in the press release, nor was the fact that the loan had been orchestrated by Discala, who had a significant ownership stake in CodeSmart.

51.    Earlier, in May 2013 and June 2013, Shapiro made statements in two press releases during the first pump and dump concerning purported agreements between CodeSmart and universities that misrepresented material facts or omitted material facts that would have been necessary to make these representations not misleading. On May 28, 2013, CodeSmart issued a press release stating that "[t]he CodeSmart Group Inc. . . . announces today that its CodeSmart University product is the exclusive strategic partner for ICD-10 education and consulting services to [a university] . . . which will exclusively market and provide CodeSmart University products to their students . . . ." The press release included a quote from Shapiro, stating that the "University has already begun to offer CodeSmart University programs for both experienced coders and new coders [and] will serve as the distribution channel to all" affiliated schools

15

throughout the state. CodeSmart was not, however, the "exclusive strategic partner" for ICD-10 education courses. In addition, contrary to Shapiro's statement that the course was being offered to "both experienced coders and new coders," the true fact was that the university had been offering the CodeSmart course for some time, but only one person had ever registered to take the course.

52. On June 4, 2013, CodeSmart issued a press release stating that "The CodeSmart Group Inc. . . . announces today that its CodeSmart University product is the exclusive strategic partner for ICD-10 education and consulting services" to a college "which will exclusively market and provide CodeSmart University products to their students . . . ." In the release, Shapiro stated "Our partnership with [the college] is our first in Northern New Jersey, and we believe that this partnership, along with the numerous medical educations venues with which [the college] is affiliated, will help to prepare the region for the challenges ahead with regard to ICD-10 certification." The college had not authorized the press release and, as of the date of Shapiro's statement, the college had not finalized an agreement with CodeSmart.

53. Both press releases had an impact on trading in CodeSmart's stock in May and June. On May 28, 2013, the date of the first press release, the trading volume of CodeSmart's shares more than doubled from the business day before the press release. In addition, on the date of the press release, the price of CodeSmart's shares increased by almost five percent, from $5.02 per share to $5.26 per share. On June 4, 2013, the date of the second press release, the price of CodeSmart's shares increased by approximately 3 percent.

vi. *Profits from the CodeSmart Scheme*

54. The scheme involving CodeSmart's stock was highly profitable. Discala, Wexler, Bell and Josephberg sold a significant portion of their shares in CodeSmart at inflated prices. In

total, Discala and Wexler reaped millions of dollars of illicit gains from their participation in the scheme and Bell and Josephberg both reaped in excess of $500,000 of illicit gains.

## II.    The Scheme Involving Staffing

55.    Discala, Wexler, Bell, and others also manipulated the market in Staffing securities. In August 2013, Bell, Wexler, and Discala's assistant received 240,000, 50,000, and 14,550 shares of Staffing stock, respectively. The share certificates were all dated August 28, 2013. Around mid-March 2014, the price of Staffing's stock began to rise, from approximately $0.30 per share, to a peak of approximately $0.60 per share on April 3, 2014, and the stock traded at higher volume. Simultaneously, from March 20 to April 9, 2014, Staffing issued three laudatory press releases claiming "significant revenue growth," "significant client uptake," and the expansion of its business. From April 3 to May 6, 2014, the share price declined back to the $0.30 per share level.

56.    Text messages exchanged between cellphone numbers subscribed to Discala and Wexler show that during the period when Staffing's share price peaked and then began to decline, the two were engaging in matched orders in their trading of Staffing at pre-set prices.

57.    Discala and Wexler's exchanges included the following (Staffing is referred to as "ts"):

| April 1, 2014 | April 2, 2014 | April 2, 2014 | April 3, 2014 | April 8, 2014 |
|---|---|---|---|---|
| **Discala**: Make sure ts has bid. Ty bro, <br> **Wexler**: It's in. <br> **Discala**: Ty ty | **Discala**: Is bid in. For ts. ??? I'll open sset. Already opened ts <br> … <br> **Discala**: Buy 5th ts. I am. Break through time. <br> **Wexler**: Buy 5th what? Dirk needs to buy another 10 grand to avg up. Tell him. <br> **Discala**: T's 5k. It's OK just move bid up. I'm all over it <br> **Wexler**: Awesome <br> **Discala**: Yes sir. Move bid to 49. We got these bastards. | **Discala**: Yes. We got ts on ropes. Help me. <br> . . . <br> **Wexler**: Let's get it to 59. Let's roll, I'm buying <br> **Discala**: Good. They just hit us. <br> **Wexler**: 10 k shares we at 59 <br> **Discala**: Jobo on it. Buy some. Helps us huge. <br> **Wexler**: Oh yeah Losd up a bid bro[.] 58. Hold it. I'll go behind ya <br> **Discala**: On it. Follow me up. | **Discala**: See if you can get a bid on ts at 52. For 5k. <br> **Wexler**: I can't but no more bro. I think I'm in there 1000 at 51, I'm squeezed need a little luquid for emergency. | **Discala**: Can u bid ts please. Ty bro. <br> **Wexler**: I have no cash can only do 1000? That help? |

58.     At certain points in their exchanges, Discala referred to bids for Staffing which were consistent with where Staffing was trading at that time. For example, on April 2, when Discala wrote "[l]et's get it to 59," Staffing's intra-day high was $0.59.

### III.     The Scheme Involving Cubed

59.     Discala, Wexler, Bell, and others also manipulated the market in Cubed's securities. Cubed began its life as Northwest, a purported mining exploration stage company that in reality was a shell with only nominal assets and no revenues from inception through the end of its most recent fiscal year. Similar to First Independence, Northwest never took any significant steps in furtherance of its purported business plan. On March 6, 2014, Cubed filed a Form 8-K with the Commission reporting the appointment of a new sole officer and director for the

company. The new officer was the President and COO of Crackpot, a "developer of a mobile-first information communications technology that offers users a digital platform for the creation of content that combines text, images, audio, and video."

60.     Cubed's stock began trading in earnest on April 22, 2014, at a price of $5.25. As of July 10, 2014, the stock closed at $6.65. Since April 22, 2014, the stock has moved incrementally upward in a pattern that suggests controlled trading, with the volume remaining small, with only one day exceeding 20,000 shares.

61.     In addition, the stock's valuation does not reflect the underlying economics of the company. At $6.58 per share on June 24, 2014, Cubed's market capitalization is approximately $170 million. However, in a Form 10-Q filed with the Commission for the period ending February 28, 2014, Cubed reported less than $1,500 in cash, negative stockholders' equity, a loss of $15,000, and accrued professional fees of $131,824.

62.     Text message exchanges in April 2014 demonstrate the ongoing efforts of Discala, Wexler, and Bell to manipulate the market through matched trading for Cubed's stock at pre-set prices. For example, on April 16, Discala directed Bell to "Bid crpt." On April 17, Bell asked Discala, concerning whether Cubed's stock would begin trading, "Today you think? [I've got] buyers ready and they are asking." Discala responded, "I think so" and "Tell them to bid size." Later that day, Bell informed Discala, "We put orders in at 5.25," to which Discala responded "Drop . . . bid to 510 or 515. Please." On April 22, Bell texted Discala, "We be trading." Discala answered, "Buy some brother. Let's go." Bell replied, "Just did. 5.25." Later that day, Discala texted Bell, "Need u in need to get to 2[0]k please," and Bell replied, "I bought 3000 and am making calls." On April 22, the trading volume in Cubed's stock reached 17,400 shares, its third highest day in terms of volume ever and the stock traded between $5.10 and

19

$5.25.

63.     On April 23, Discala texted Wexler, "Let's get through 20k." Wexler responded, "Would love too. Made some calls etc. Where's the IR team? They alive?" On April 23, Cubed's trading volume reached 20,700 shares, its busiest trading day to date. On April 24, Discala directed Bell to "Make calls" for "Bids please." Bell asked, "What price," and Discala replied, "527." On April 24, the stock traded between $5.24 and $5.30. The same day, Wexler texted Discala, "We'll worry about volume as we go forward, we have a bunch of things to work through together, it's me and you." Later on April 24, Wexler complimented Discala on a Cubed press release that had been issued that day: "That's a nice release! Well done pops." Discala replied, "Trying my best."

64.     Discala and Wexler knew that Cubed's stock was essentially worthless. For example, on April 2, Wexler asked Discala to ask someone affiliated with Cubed if "we can now download app?" Discala responded, "We can't," followed by Wexler texting "We couldn't if we could" and Discala ending with "Lol lol lol." On April 16, Wexler texted Discala, "I'd love to be able to get some Puts today pop."[2] After Discala responded, "Me too," Wexler replied, "I don't think we're liquid enough[.] Soon I will hope. After first [disbursement]." Later on April 16, Discala boasted to Wexler about a new investor in Cubed's stock, and added "not bad with SH[*]T." Wexler responded, "now let's run company for these guys."

65.     Additional text message exchanges in May 2014 similarly show that the trading between Discala, Wexler, and Bell was coordinated. For example, on May 29, Discala texted Bell, "Bid 647. 100 shares ASAP on crpt." Bell replied, "Done. Scottrade." An hour later,

---

[2]     A "put" is a type of security that enables the purchaser to bet that the price of the security will decline at some point in the future.

Discala texted Wexler to bid "47." Wexler responded, "Who bid 47." Discala replied, "Matt bell," to which Wexler responded, "All right. It held."

66.     In addition, Josephberg was a participant in the Cubed scheme. Josephberg wrote to Wexler looking for him to find some accounts to trade Cubed. On June 3, Josephberg texted Wexler that "Crpt is nice. Get me some accounts bro." Wexler responded that he would have accounts for Josephberg in a few weeks.

**IV.     The CodeSmart Securities over which Discala, Wexler, Bell, and Josephberg Obtained Control Were Restricted**

67.     The 3,000,000 CodeSmart shares that Discala, Wexler, Josephberg, and Bell obtained control over in May 2013 were restricted securities not eligible for resale to the public. No registration statement was filed or in effect with respect to those securities. Nor were the securities exempt from registration by virtue of any Commission regulation.

68.     The Form S-1 that First Independence filed and that became effective in August 2012 applied to the distribution of 3,000,000 First Independence shares to 24 shareholders in January 2013. However, the S-1 did not authorize any subsequent distribution of those shares to others or to the general public.

69.     The original 24 shareholders of First Independence, from whom Discala, Wexler, Josephberg, and Bell acquired their shares, were affiliates of First Independence. An undisclosed control person of First Independence was able to gather all of the shares a few months after they were sold to the original 24 shareholders in January 2013 and sell them to Discala, Wexler, Josephberg, and Bell, and entities or persons they controlled, in May 2013. Nearly all the May 2013 transactions occurred on the same date and at the same price.

70.     Discala, Wexler, Josephberg, and Bell could not rely on the safe harbor provided by Securities Act Rule 144 ("Rule 144") to sell their CodeSmart shares to the public. Prior to

May 2, 2013, First Independence was not subject to the reporting requirements of Section 13 of the Exchange Act, nor had First Independence ever filed any Form 10 information. As such, there was a lack of public information concerning CodeSmart, which was a requirement for its securities to be sold to the public.

71. Further, according to the Form-10-K that First Independence filed with the Commission on May 2, 2013, First Independence was a shell company. Because First Independence was a shell company, its securities could not be resold, consistent with the safe harbor provided by Rule 144, until one year had elapsed from the time the company filed Form 10 information. First Independence did not file Form 10 information until it announced its reverse merger with CodeSmart on May 9, 2013.

72. For these reasons, a May 2013 opinion letter stating that the 3,000,000 CodeSmart shares that Discala, Wexler, Josephberg, and Bell controlled were not restricted was defective.

## CLAIMS FOR RELIEF

### CLAIM I
### Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder
### (Against All Defendants)

73. The Commission re-alleges and incorporates by reference paragraphs 1 through 71, as though fully set forth herein.

74. In 2013, or at various times during such period, Defendants, directly or indirectly, by the use of the means or instrumentalities of interstate commerce, or of the mails, or a facility of a national securities exchange, in connection with the purchase or sale of securities, knowingly or recklessly: (a) employed devices, schemes or artifices to defraud; or (b) engaged in acts, practices or courses of business which operated as a fraud or deceit upon any person.

75. As part of and in furtherance of this violative conduct, Defendants, directly or

indirectly, employed the deceptive devices, schemes, artifices, contrivances, acts, transactions, practices, and courses of business and/or made misrepresentations and/or omitted to state the facts alleged above.

76.     By virtue of the foregoing, Defendants, directly or indirectly, violated, and unless enjoined, will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

**CLAIM II**
**Violations of Section 17(a)(1) and (3) of the Securities Act**
**(Against Discala, Wexler, Bell, and Josephberg)**

77.     The Commission re-alleges and incorporates by reference paragraphs 1 through 75, as though fully set forth herein.

78.     By virtue of the foregoing, Discala, Wexler, Bell, and Josephberg, directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, or of the facilities of a national securities exchange, in the offer or sale of securities, knowingly or recklessly: (a) employed devices, schemes, and artifices to defraud; or (b) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities offered and sold by Discala, Wexler, Bell, Josephberg, and other persons.

79.     As part of and in furtherance of a fraudulent scheme, Discala, Wexler, Bell, and Josephberg, directly or indirectly, singly or in concert, employed the deceptive devices, schemes, artifices, contrivances, acts, transactions, practices, and courses of business and/or made misrepresentations and/or omitted to state the facts alleged above.

80.     By reason of the foregoing, Discala, Wexler, Bell, and Josephberg violated, and unless enjoined will continue to violate, Section 17(a)(1) and (3) of the Securities Act [15 U.S.C.

23

§§ 77q(a)(1) and (3)].

## CLAIM III
### Violations of Section 9(a) of the Exchange Act
### (Against Discala, Wexler, Bell, and Josephberg)

81.    The Commission re-alleges and incorporates by reference paragraphs 1 through 79, as though fully set forth herein.

82.    Discala, Wexler, Bell, and Josephberg, directly or indirectly, with scienter, by use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, or for any member of a national securities exchange, for the purpose of creating a false or misleading appearance of active trading in CodeSmart, Cubed, and/or Staffing, or a false and misleading appearance with respect to the market for CodeSmart, Cubed, and/or Staffing, engaged in the following unlawful activity:

    a.    Effected transactions in the securities which involved no change in the beneficial ownership thereof;

    b.    Entered an order or orders for the purchase of the securities with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the sale of the securities, had been or would be entered by or for the same or different parties; or

    c.    Entered an order or orders for the sale of the securities with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the purchase of the securities, had been or would be entered by or for the same or different parties.

83.    Discala, Wexler, Bell, and Josephberg, directly or indirectly, with scienter, by use of the mails or any means or instrumentality of interstate commerce, or of any facility of any

national securities exchange, or for any member of a national securities exchange, effected, alone

or with one or more persons, a series of transactions in CodeSmart, Cubed, or Staffing securities

creating actual or apparent trading in those securities, or raising or depressing the price of those

securities, for the purpose of inducing the purchase or sale of those securities by others.

84.     By virtue of the foregoing, Discala, Wexler, Bell, and Josephberg violated, and

unless enjoined will continue to violate, Section 9(a) of the Exchange Act [15 U.S.C. § 78i(a)].

**CLAIM IV**
**Violations of Section 10(b) of the Exchange Act and Rules 10b-5(b) thereunder**
**(Against Bell, Josephberg, and Shapiro)**

85.     The Commission re-alleges and incorporates by reference paragraphs 1 through

83, as though fully set forth herein.

86.     By virtue of the foregoing, Bell, Josephberg, and Shapiro, directly or indirectly,

by the use of the means or instrumentalities of interstate commerce, or of the mails, or a facility

of a national securities exchange, in connection with the purchase or sale of securities,

knowingly or recklessly, made untrue statements of a material fact or omitted to state a material

fact necessary in order to make the statements made, in the light of the circumstances under

which they were made, not misleading.

87.     Bell's, Josephberg's, and Shapiro's false and misleading statements and/or

omissions were material.

88.     Bell, Josephberg, and Shapiro knew, or were reckless in not knowing, that these

material misrepresentations and omissions were false or misleading.

89.     The material misrepresentations and omissions were in connection with the

purchase or sale of securities.

90.     By virtue of the foregoing, Bell, Josephberg, and Shapiro, directly or indirectly,

violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

## CLAIM V
### Violations of Section 17(a)(2) of the Securities Act
### (Against Bell and Josephberg)

91.     The Commission re-alleges and incorporates by reference paragraphs 1 through 89, as though fully set forth herein.

92.     By virtue of the foregoing, Bell and Josephberg in the offer or sale of securities, by the use of means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly, obtained money or property by means of an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

93.     Bell's and Josephberg's false and misleading statements and/or omissions were material.

94.     Bell and Josephberg knew, or were reckless in not knowing, that these material misrepresentations and omissions were false or misleading.

95.     The material misrepresentations and omissions were made in connection with the offer or sale of securities.

96.     By virtue of the foregoing, Bell and Josephberg violated, and unless enjoined will continue to violate, Section 17(a)(2) of the Securities Act [15 U.S.C. §77q(a)(2)].

## CLAIM VI
### Violations of Section 5(a) and 5(c) of the Securities Act
### (Against Discala, Wexler, Bell, and Josephberg)

97.     The Commission re-alleges and incorporates by reference paragraphs 1 through 95, as though fully set forth herein.

26

98.     The CodeSmart shares Discala, Wexler, Bell, and Josephberg offered and sold to the investing public constitute "securities" as defined by Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(1) of the Exchange Act [15 U.S.C. § 78c(a)(1)].

99.     Discala, Wexler, Bell, and Josephberg, directly or indirectly, singly or in concert, made use of the means or instruments of transportation or communications in interstate commerce, or the mails, to offer and sell securities through the medium of a prospectus or otherwise when no registration statement had been filed or was in effect as to such securities and when no exemption from registration was available.

100.    By virtue of the foregoing, Discala, Wexler, Bell, and Josephberg violated, and unless enjoined will continue to violate, Section 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## **RELIEF SOUGHT**

**WHEREFORE**, the Commission respectfully requests that this Court enter a Final Judgment:

### **I.**

Permanently restraining and enjoining Defendants, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

### **II.**

Permanently restraining and enjoining Discala, Wexler, Bell, and Josephberg, their officers, agents, servants, employees, and attorneys, and those persons in active concert or

participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Section 9(a) of the Exchange Act [[15 U.S.C. § 78i(a)] and Sections 5(a), 5(c), 17(a)(1), and 17(a)(3) of the Securities Act [15 U.S.C §§ 77e(a), 77e(c), 77q(a)(1), and (3)].

## III.

Permanently restraining and enjoining Bell, Josephberg, and Shapiro, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

## IV.

Permanently restraining and enjoining Bell and Josephberg, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Section 17(a)(2) of the Securities Act [15 U.S.C § 77q(a)(2)].

## V.

Ordering Defendants to pay, on a joint and several basis, disgorgement along with prejudgment interest, all illicit trading profits, or other ill-gotten gains received as a result of the conduct alleged in this Complaint.

## VI.

Ordering Defendants to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## VII.

Permanently restraining and enjoining Defendants from participating in the offering of any penny stock pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)].

## VIII.

Barring defendants Discala, Wexler, and Shapiro, pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)]; and

## IX.

Granting such other and further relief as this Court may deem just and proper.

Dated: New York, New York
July 17, 2014

Respectfully submitted,

Charles D. Riely (rielyc@sec.gov)
Sheldon L. Pollock (pollocks@sec.gov)
Matthew J. Watkins (watkinsma@sec.gov)
Attorneys for Plaintiff
SECURITIES AND EXCHANGE
COMMISSION
New York Regional Office
Brookfield Place, Suite 400
200 Vesey Street
New York, New York 10281
(212) 336-1100

Of Counsel:

Daniel M. Hawke (hawked@sec.gov)
(Not admitted in the E.D.N.Y.)